UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GILBERT PEREZ,                    :

     Plaintiff,                  :

                                     CIVIL ACTION NO.

v.                               :

                                       1:12-CV-3161-MHS

SPRINT/UNITED MANAGEMENT  :
COMPANY,
                              :

     Defendant.                  :

                                    :

## ORDER

This action is before the Court on the parties' cross motions for summary judgment.  For the reasons set forth below, the Court denies plaintiff's motion and grants in part and denies in part defendant's motion.

Background

Plaintiff Gilbert Perez brings this discrimination case pursuant to Title I of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12112, against his former employer Sprint/United Management Company ("Sprint"). Plaintiff alleges the following claims in his complaint: (1) defendant discriminated against him because of his disability by terminating him; (2)

defendant discriminated against him by failing to make a reasonable accommodation for his disability and failing to engage in an interactive process regarding his accommodation request; and (3) defendant intentionally retaliated against plaintiff by terminating his employment. Plaintiff seeks compensatory and punitive damages and attorneys' fees, an order that defendant rehire him to his prior position or award front pay sufficient to compensate him for his loss, and a permanent injunction prohibiting defendant from further discriminating against disabled employees.

The following facts are undisputed unless otherwise noted.[1] Sprint is a telecommunications company that provides wireless, wireline, and internet services. Sprint uses an Executive Briefing Center ("EBC") in Atlanta as a sales tool. Sprint's sales employees can bring actual and prospective customers to the EBC to provide them with an overview of the technology Sprint offers and demonstrations of this technology. In addition to these customer events, the EBC also hosts training and demonstration events for Sprint employees. On average in 2011 and 2012, the EBC hosted about four events per week.

---

[1] The Court discusses more disputed facts throughout this order.

2

Since 1998, plaintiff was a Systems Engineer II at EBC. He was responsible for ensuring that all of the equipment needed for a presentation or demonstration was set up and in working order well in advance of the presentations. He was also responsible for troubleshooting audio and video issues at the EBC and overseeing the changeover of new networking equipment, which occurred frequently.

The EBC was staffed by plaintiff, Natalie Palmer, Jordan Greene, and Janita Kish, who was the manager. Each member had certain preparations to complete in order for a presentation to be successful.

In 2005, plaintiff's orthopedist, Dr. Scott Quisling, diagnosed plaintiff as having bilateral ankle degenerative joint disease. In 2011, plaintiff's condition worsened, he was in a lot of pain, and he started to use a cane. Plaintiff's knee gave out occasionally, and his ankle was unpredictable. Also in 2011, plaintiff began to have difficulty with some of the physical aspects of his job. Defendant contends that in July 2011 Ms. Kish noticed that plaintiff began to have some difficulty performing his job duties while

3

plaintiff maintains that he was able to perform the essential functions of his position.

By August 2011, plaintiff told Ms. Kish that his ankle pain was the worst it had ever been. Plaintiff requested that he be allowed to sit with his leg raised whenever possible, and Ms. Kish agreed. At this time, Ms. Kish made sure that plaintiff sat down, with his leg raised, as much as possible and instructed him to let her or his teammates know whenever he needed help. Also in the summer of 2011, Ms. Kish suggested plaintiff look at job postings for positions within Sprint that were less physically demanding, but plaintiff did not do so because he thought Ms. Kish was joking.

By September 2011, plaintiff's condition had not improved. On September 16, 2011, Ms. Kish gave plaintiff a blank Sprint Reasonable Accommodation/Medical Information Form ("September Form") and asked that plaintiff's doctor fill it out so that she would have direction about what he could and could not do. Ms. Kish also asked plaintiff if there was anything else that she could do to assist him other than what she and his teammates

4

were already doing, to which plaintiff responded that there was nothing else they could do.

Dr. Quisling completed the September Form, and plaintiff returned it to Ms. Kish in October. Dr. Quisling stated that plaintiff's impairments were left ankle and left knee pain. He noted that plaintiff's impairment was long term or permanent but indicated that the duration of his injuries was to be determined within approximately 8-10 weeks. He also noted that the activities of walking, bending, and standing were affected and that plaintiff was substantially limited in one or more of these major life activities. Dr. Quisling stated that plaintiff was unable to walk extended distances and unable to squat or bend multiple times a day. Dr. Quisling's suggested accommodations were for plaintiff to work light duty with limited walking, which would enable plaintiff to work with limited or little pain. Dr. Quisling and plaintiff were hopeful that light duty would help plaintiff's inflammation so that he could seek additional treatment.

Plaintiff discussed Dr. Quisling's findings with Ms. Kish. He understood light duty to mean for him to limit his walking, limit or avoid

bending, and to not stand for long periods of time. According to defendant, Ms. Kish decided to temporarily accommodate plaintiff by performing his physical duties.

During a meeting on October 20, 2011, Ms. Kish again asked plaintiff what else she or his team could do, and he responded nothing more than what they were already doing. She again suggested plaintiff review job postings, and she informed him of his rights under the Family Medical Leave Act ("FMLA") and Sprint's Short-Term Disability Leave policy.

In November 2011 and January 2012, plaintiff's movements were still limited, and by January he was taking precautions regarding what he could do. On January 24, Ms. Kish discovered plaintiff in severe pain and immobilized a few minutes before a presentation was scheduled to begin. As a result, plaintiff was unable to complete setting up laptops for the presentation, and his pain was so extreme that he could not focus on his work. Following this incident, Ms. Kish presented plaintiff with a second blank Sprint Reasonable Accommodation/Medical Information Form

6

("February Form") for Dr. Quisling to complete.  She also provided plaintiff with a copy of Sprint's FMLA and Short-Term Disability Leave applications.

Dr. Quisling completed the February Form on February 2, 2012.  Dr. Quisling noted that plaintiff had a physical impairment in the form of knee and ankle difficulties.  The form states that plaintiff's impairment affected his major life activities of working, walking, and lifting, and that he was substantially limited in one or more of these major life activities. The form states that plaintiff's impairment was long-term or permanent. Dr. Quisling wrote that plaintiff's ankle and knee pain impaired his ability to stand, walk, and lift.

The February Form also asks whether an accommodation is needed in order for the employee to perform the essential functions of his job.  Rather than allow space for an answer to this question, the form continues with other questions that may help the doctor determine whether an accommodation is needed.  In response to the question of what job functions the employee was having difficulty performing, Dr. Quisling noted that plaintiff was having trouble with distance walking, squatting, and long-term

7

standing. In response to the question of how the employee's impairment interfered with his ability to perform his job functions, Dr. Quisling noted that plaintiff had limits on his range of motion due to pain and swelling. Next, the form asks for any suggestions regarding possible accommodations, to which Dr. Quisling noted "limit walking, [no] squatting, limit standing." Kish Dep., Ex. 15 at 3. Dr. Quisling noted that these recommended accommodations would reduce plaintiff's pain and increase his function.

On February 7, 2012, plaintiff left the February Form on Ms. Kish's desk for her before leaving for a training in Kansas City. On or about February 15, after plaintiff returned to Atlanta, he met with Ms. Kish. Ms. Kish again recommended plaintiff look at job postings and reminded him of defendant's FMLA and Short-Term Disability Leave policies. Ms. Kish reviewed the essential functions of plaintiff's job with him. Ms. Kish asked what defendant could do to accommodate him, and plaintiff contends that he requested to be able to sit down during long meetings and receive assistance with lifting heavy objects. Ms. Kish did not respond to his requests. According to plaintiff, Ms. Kish stated that he "could lose [his] job for this."

8

Pl.'s Dep. at 301. Plaintiff continued to work from February 15 to February 24 and contends he was not granted the two accommodations he requested.

Ms. Kish along with Amy Canton, a Human Resources Manager for defendant in Kansas City, were concerned that Dr. Quisling had indicated that plaintiff's condition was permanent. Ms. Kish and Ms. Canton concluded that plaintiff could not perform the essential functions of his position with or without a reasonable accommodation. Ms. Kish determined that it was unreasonable for her to perform all of the physical aspects of plaintiff's job indefinitely. At the time, there were no other positions available within the EBC.

On or about February 21, 2012, Ms. Kish, Ms. Canton, and John Heiman, the Director of Marketing for defendant and Ms. Kish's supervisor, participated in a conference call regarding plaintiff's performance and the February Form. Ms. Kish made the recommendation to terminate plaintiff.

On February 24, 2012, Ms. Kish terminated plaintiff and told him that he was fired because he could not perform the essential functions of his job.

9

Plaintiff was approved for FMLA leave from approximately February 24 until March 11, 2012.  His termination became effective on March 11.  Soon thereafter, plaintiff applied for Short-Term Disability, which defendant denied on March 8, 2012.[2]  Plaintiff did not appeal this decision or provide further documentation.

Plaintiff timely filed charges with the Equal Employment Opportunity Commission ("EEOC"), received a Notice of Right to Sue, and filed his complaint in this Court.  After discovery closed, plaintiff moved for summary judgment on his claim that defendant discriminated against him because of his disability by firing him.  Defendant then moved for summary judgment on all of plaintiff's claims.  These cross motions for summary judgment are now before the Court.

Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "there is no genuine issue as to any material

---

[2] The parties have not explained how plaintiff's termination was effective on March 11, but he was denied short-term disability benefits on March 8.

fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Supreme Court held that this burden could be met if the movant demonstrates that there is "an absence of evidence to support the non-moving party's case." Id. at 325. At that point, the burden shifts to the non-moving party to go beyond the pleadings and present specific evidence giving rise to a triable issue. Id. at 324.

In reviewing a motion for summary judgment, the Court must construe the evidence and all inferences drawn from the evidence in the light most favorable to the non-moving party. WSB-TV v. Lee, 842 F.2d 1266, 1270 (11th Cir. 1988). Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (emphasis in original).

The Rule 56 standard is not affected by the filing of cross-motions for summary judgment: "The court must rule on each party's motion on an

11

individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2720 at 335-36 (3d ed. 1998). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. See United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984).

Discussion

I. ADA Discrimination

Title I of the ADA prohibits an employer from discriminating against a qualified individual on the basis of a disability. 42 U.S.C. § 12112(a). The statute prohibits discrimination with regard to the discharge of employees as well as failing to make reasonable accommodations to the known limitations of an otherwise qualified employee. Id. at §§12112(a), (b)5(A). To establish a prima facie case of employment discrimination under the ADA, plaintiff must prove that (1) he has a disability; (2) he is a qualified individual; and (3) he was unlawfully discriminated against because of his disability. Id.; see D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220, 1226 (11th Cir. 2005).

12

Under this third prong, plaintiff may prove discrimination by direct or indirect evidence.

### A. Disabled

Pursuant to the ADA, a disability is defined as a "physical or mental impairment that substantially limits one or more of the major life activities of [an] individual," being regarded as having such an impairment, or a record of such an impairment. 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g)(1). Plaintiff has argued that he is disabled under the ADA, and defendant has not contested this in its summary judgment briefing.[3] Therefore, the Court finds that plaintiff is disabled under the ADA.

### B. Qualified Individual

A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position" at issue. 42 U.S.C. § 12111(8). Plaintiff "must show

---

[3] Defendant states in its response to Plaintiff's Statement of Material Facts that plaintiff was not disabled as defined by the ADA. The Court will not consider any legal argument made by defendant in its response. See LR 56.1B, NDGa. Moreover, defendant failed to address or argue that plaintiff was not disabled in its summary judgment briefing.

13

either that he can perform the essential functions of his job without accommodation, or, failing that, show that he can perform the essential functions of his job with a reasonable accommodation." Davis v. Fla. Power & Light Co., 205 F.3d 1301, 1305 (11th Cir. 2000). If plaintiff "is unable to perform an essential function of his . . . job, even with an accommodation, he is, by definition, not a 'qualified individual' and, therefore, not covered under the ADA." Id. Stated differently, defendant is not required by the ADA to eliminate an essential function of plaintiff's job. Id.

The ADA regulations define "essential functions" as the "fundamental job duties of the employment position the individual with a disability holds or desires" and this does not include the marginal functions of the position. 29 C.F.R. § 1630.2(n)(1). "Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors. The ADA provides that consideration shall be given to the employer's judgment as to what functions of a job are essential and the employer's written description for that job." See Davis, 205 F.3d at 1305; see also 42 U.S.C. § 12111(8). However, the Eleventh Circuit has also considered testimony from plaintiff's supervisor. Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1257 (11th Cir. 2007). The

14

appellate court has further explained that "although the employer's view is entitled to substantial weight in the calculus, this factor alone may not be conclusive." Id. at 1258. (quotation omitted).

As noted above, plaintiff was a Systems Engineer II in the EBC. The job description provided by defendant for this position is as follows:

> The Systems Engineer position is customer facing with responsibilities for the technical operations and support of the briefing center facility and program. Responsibilities include: management and administration of LAN/WAN infrastructure, pc/laptops, audio/visual systems, CDMA, IDEN, 802.16/WiMax equipment and services, including installation, break-fix, maintenance and upgrades; product demonstrations; testing of hardware, software and applications; documentation of system functionality and processes; provides technical support of remote events; demonstrate Sprint solutions (network, devices, etc.) and lead discussions for customer/prospect events; directly supports and is back up to the Briefing and Demonstration Manager; customer facing: reports directly to the General Manager and has no direct reports. Support off-site events on occasion with some travel.

Kish Dep., Ex. 5.

In February of 2012, defendant amended this written job description to include physical job duty requirements as follows:

15

Addition; Physical job duty requirements for the Atlanta SE position:
- Majority of Day-to-Day Time Spent on Feet
- Climbing and Standing on Ladders (4ft-6ft)
- Lifting and Moving Network (rack mounted) & Demonstration Equipment
- Moving Demonstration Kiosks
- Moving Mobile Video Conference Equipment
- Reconfiguring Mobile Conference Tables & Running Cables from Floor
- Above Ceiling and Floor Cable Management
- Manage Ceiling Mounted Cameras - Frequent Adjustments

Id.

The parties debate whether these physical requirements were actually essential functions of plaintiff's position especially in light of the fact that defendant amended the written job description in the same month that defendant was terminated. After a careful review of the record, the Court finds that no reasonable jury could disagree that the essential functions of plaintiff's job included these physical requirements. Plaintiff's own testimony confirms that these physical requirements were essential functions, along with walking, standing, and lifting. Pl.'s Dep. at 216-218.

16

The question is then whether plaintiff could perform these essential functions with or without a reasonable accommodation in order to be a qualified individual. After a thorough review of the record, the Court finds that there are genuine issues of material fact regarding whether plaintiff could perform these essential functions either with or without an accommodation.

First, with regard to whether plaintiff could have performed his essential functions without any accommodations, plaintiff testified repeatedly that he could perform the physical requirements of his job and that he had been completing all duties up until his termination. Additionally, defendant had not ever written up plaintiff for his performance leading up to the February termination and there were no problems with any of the 10-16 monthly customer briefings that plaintiff assisted with from July 2011 to February 2012.

17

Plaintiff's co-worker Natalie Palmer also testified that she did not witness plaintiff being unable to perform these physical duties.[4]  Although she explained that she did not have a specific recollection of what he did on a day-to-day basis, she did testify that she spent almost every day with him. She witnessed him setting up for client briefings in December 2011 and January and February 2012, and she explained that plaintiff was able to do his job to support the client presentations in those months.

Another one of defendant's employees, David Pragel, who visited the EBC at least once a month, testified that he did not see any changes in plaintiff's performance in the last seven months before plaintiff's termination, except that he noticed plaintiff using a cane.  Mr. Pragel specifically witnessed plaintiff climb a ladder while using his cane to fix something in the ceiling and testified that he did not seem impaired when he was climbing the ladder and was able to complete his work. Mr. Pragel further testified that

---

[4] Defendant interprets Ms. Palmer's testimony as she never *witnessed* plaintiff trying any of these tasks, and therefore, she cannot support plaintiff's position that he was able to do them because she never saw him.  On the other hand, plaintiff interprets her testimony as plaintiff was able to perform because Ms. Palmer never saw him being *unable* to perform.

AO 72A
(Rev.8/82)

he helped plaintiff lift and move mobile video conference equipment, which was heavy and required two people to move it.[5]

On the other hand, plaintiff's supervisor Janita Kish testified that in the seven months leading up to plaintiff's termination she witnessed that plaintiff was unable to walk for prolonged periods of time, move demonstrations kiosks, climb, and stand. She explained that he was struggling with performing his physical duties and he took a long time to complete his tasks. Ms. Kish testified that she oftentimes completed plaintiff's physical job duties for him.[6] Ms. Kish testified that after she received his September Form from Dr. Quisling, she was under the impression that he could not, and should not, do any of the physical requirements of his job. Therefore, she explained that if she saw him start

---

[5] Mr. Pragel also admitted that he would not have known whether other team members set up equipment at the EBC before he arrived and what plaintiff's physical limitations would have been when Mr. Pragel was not there.

[6] Plaintiff admits that co-workers helped him with hooking up tables but that very little was done as far as he knew to help him with his physical tasks. He also admits that he does not know specifically how often his team members helped with the physical aspects of his job. On the other hand, Ms. Palmer admitted that it was common for all team members to help each other.

19

to try to do any of these physical duties, she stepped in and asked him not to do them.[7]

Additionally, another one of plaintiff's co-workers, Jordan Greene, stated in her declaration that by the summer of 2011, she noticed that plaintiff was in pain, was using a cane, and physically struggled to perform his job. She also contends that during the summer of 2011 Ms. Kish stepped in to perform the physical aspects of plaintiff's job. Ms. Greene states that she saw plaintiff stumble or falter more than one time.

Regarding the February Form from Dr. Quisling, the parties debate whether Dr. Quisling's notes mean that plaintiff was disabled and unable to perform his essential job functions.  Dr. Quisling did not state on the February Form that plaintiff was prohibited or unable to perform certain activities. His deposition testimony confirms this. Dr. Quisling testified that when he marked that plaintiff's life activities would be affected, he interpreted that to mean that if plaintiff had a heavy, difficult, or physical

---

[7] Ms. Kish admits that plaintiff might have tried to do these physical requirements when she was not there.

20

job, that the job would be difficult for him compared to a sedentary job. He further testified that "affected" did not mean "prohibited." Dr. Quisling Dep. at 93:12-21. Dr. Quisling explained that plaintiff was not prohibited from any type of lifting but that the problems he had would affect his ability to lift. Dr. Quisling testified further that in February 2012 he did not tell plaintiff that he was totally disabled from work. Dr. Quisling did not recall whether he had reviewed an essential checklist of plaintiff's duties at the time he completed the February Form. After reviewing the essential physical requirements of plaintiff's position at his deposition, Dr. Quisling testified that the physical activities in plaintiff's job description would have been difficult for plaintiff because of the pain in his knees and ankle, and he would have discouraged him from doing these things. Dr. Quisling also suggested accommodations – to limit his walking and standing and avoid squatting – to help reduce plaintiff's pain and increase his function. Based on this evidence, a reasonable jury could find that Dr. Quisling did not conclude that plaintiff was unable or prohibited from doing certain activities, but instead that he discouraged plaintiff from performing specific physical activities to avoid pain.

21

Moreover, it is unclear what essential job functions plaintiff could actually perform in February 2012 and what defendant did to investigate plaintiff's limitations after it received the February Form. See Pinkerton v. City of Tampa, Fla., 981 F. Supp. 1455, 1458 (M.D. Fla. 1997) (denying summary judgment because defendant did not make an individualized inquiry to determine if the plaintiff could perform the essential functions of her job and therefore questions remained unanswered about whether plaintiff could perform her job duties).

Therefore, there are disputed issues of fact about whether plaintiff could actually perform the physical requirements of his job.[8] Although there

---

[8] There are additional fact issues as well. Plaintiff has presented testimony from several other co-workers who state that they did not witness plaintiff having any difficulties performing the physical aspects of his job. Yet, defendant argues that these co-workers were not at the EBC often enough to have a complete picture of plaintiff's abilities. There is also a fact issue about a letter from defendant's Leave Management Group ("LMG") denying plaintiff's short term disability benefits. LMG states in its letter that it denied plaintiff's benefits because, inter alia, it did not find sufficient documentation to support that his medical conditions caused limitations severe enough to prevent him from performing his job and the information in his file did not provide medical substantiation of any complicating medical condition that prevented him from returning to work full-time. Plaintiff contends that this shows he was able to return to work because there was insufficient evidence that he could not perform his job while defendant maintains that LMG decided it did not have sufficient documents in his file to qualify him for benefits. Again, without further evidence from LMG about what it actually meant,
(continued...)

22

is evidence from which a jury could find that plaintiff could perform the essential functions of his job without any accommodations, the Court's role is not to weigh the evidence and instead to leave credibility determinations up to the jury. See Anderson, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

Turning then to whether plaintiff could have performed his essential functions with reasonable accommodations, plaintiff bears the burden of proving that reasonable accommodations exist, and defendant then must present evidence to show that the requested accommodations impose an undue hardship on the employer. Terrell v. USAir, 132 F.3d 621, 624 (11th Cir. 1998). Although plaintiff asserts that he could have performed the essential functions of his position without any accommodations as explained

[8](...continued)
what documents were in plaintiff's file, and what it reviewed, a reasonable jury could accept plaintiff's or defendant's view on this issue.

AO 72A
(Rev.8/82)

above, he argues in the alternative that if he could not have performed all of these functions, he requested two accommodations to help him.[9]

Plaintiff contends that he requested two reasonable accommodations to Ms. Kish in February 2012 after he gave her the February Form: (1) to be allowed to sit down during long meetings in the conference room and (2) to receive help lifting anything very heavy (or anything that required two people to lift it).[10]  According to plaintiff, he received no response when he asked Ms. Kish for these accommodations, and instead, Ms. Kish said that he "could lose

---

[9] Part of the reason plaintiff takes this alternative approach is because he contends that the physical requirements were not essential functions of his job and instead that his essential functions were technical operations, support for the EBC, and troubleshooting. So, in response to defendant's argument that his job required physical duties, he argues that he could have performed all of these duties either with or without an accommodation.

[10] Dr. Quisling's recommended accommodations were for plaintiff to limit his standing and walking and to not squat.  Plaintiff testified that he could avoid squatting by bending. Although plaintiff requested a reasonable accommodation to avoid standing during long meetings, he did not request an accommodation for walking, and therefore, defendant had no duty to accommodate plaintiff's disabilities with regard to walking.  See Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir. 1999) ("The duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made.").  Even if plaintiff had made a request to limit walking, it is unclear what reasonable accommodations could have been made to assist plaintiff with walking and whether these accommodations imposed an undue hardship on defendant.

[his] job for this." Pl.'s Dep. at 301. Plaintiff maintains that if defendant had met his requests for these two accommodations, he could have performed the essential functions of his job.[11]

Defendant argues that no accommodations were necessary because plaintiff could not perform the essential functions of his job with *any* accommodations. Defendant contends further that even if the two accommodations requested by plaintiff could have helped plaintiff perform his job, defendant did not deny him these requests. Defendant explains that plaintiff had access to several chairs in the EBC and that he had media carts at his disposal to help with heavy lifting.[12] Finally, even if it had granted plaintiff's accommodation requests, defendant asserts he still could not have performed the essential functions of his job because these accommodations

---

[11] Plaintiff goes on to argue that defendant then failed to engage in any interactive process with him to evaluate his accommodations and has not presented evidence on summary judgment to show that these accommodations would have presented an undue hardship. See Gilliard v. Georgia Dep't of Corr., 500 Fed. App'x 860, 868 (11th Cir. 2012). The Court need not reach these issues however because disputed facts remain. See discussion infra.

[12] Yet, plaintiff testified that although chairs were available in the EBC, it was not typical for him to be allowed to sit down during meetings and Ms. Kish gave no response to his request. Also, plaintiff admits that there were media carts available but that he requested permission to use a specific, taller cart to assist with lifting, and once again, Ms. Kish did not respond to his request.

AO 72A
(Rev.8/82)

did not help with his other job duties, such as climbing and standing on a ladder and running and managing cables.

"An accommodation is 'reasonable,' and, thus, required by the ADA, only if it enables the employee to perform the essential functions of the job." Gilliard, 500 Fed. App'x at 868. It is not clear whether plaintiff could have performed the essential functions of his job if defendant had met his two requested accommodations because, as explained above, there are still issues of fact about which essential functions plaintiff could perform. For example, even if defendant had met plaintiff's two accommodation requests, questions remain about whether plaintiff could have performed his other essential job functions, such as climbing and running cables, which do not appear to have been affected by his accommodation requests. Until a jury weighs the conflicting evidence and evaluates the credibility of witnesses, the Court cannot conclude that plaintiff was a qualified individual under the ADA. See Talavera v. Sch. Bd. of Palm Beach Cnty., 129 F.3d 1214, 1221 (11th Cir. 1997) (reversing the grant of summary judgment for the employer because issues of fact remained as to whether the plaintiff was qualified since it was not clear from the record whether the accommodations would have been

reasonable or enabled the plaintiff to perform the essential functions of her job).

Similarly, the Court cannot find as a matter of law that defendant discriminated against plaintiff by failing to accommodate him because a jury must first determine whether plaintiff could perform his essential functions, and if not, whether his requested accommodations would have enabled him to do so. Only then, if plaintiff is a qualified individual who could have performed his essential functions with reasonable accommodations, could the Court evaluate whether defendant discriminated against him by failing to accommodate him. Therefore, the Court will not grant summary judgment on plaintiff's failure to accommodate claim.

C. Evidence of Discrimination

Assuming plaintiff is a qualified individual, plaintiff must still provide evidence of discrimination to make a prima facie case.

> [Plaintiff] may rely on the traditional framework and use direct evidence to create a triable issue on whether he was fired or treated less favorably because he was disabled.... Alternatively, [plaintiff] may use circumstantial evidence and rely on the

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) framework to create a triable issue.

Bass v. Lockheed Martin Corp., 287 Fed. App'x 808, 810-11 (11th Cir. 2008). (internal citations omitted).

"Direct evidence is evidence, that, if believed, proves the existence of a fact without inference or presumption." Id. at 810.  After a review of the record, the Court finds that a reasonable jury could find direct evidence of discrimination by defendant.  After defendant had made the decision to terminate plaintiff, Ms. Kish debated what to write on a State of Georgia Separation Notice that she was required to give to plaintiff.  On February 23, one day before Ms. Kish terminated plaintiff, Ms. Kish emailed Ms. Canton in Human Resources inquiring about what to say.  Ms. Kish wrote, "Is this verbiage ok for me to write in the section for circumstances of separation: Due to medical disabilities, employee is unable to perform specific responsibilities of his job.  Just want to make sure I word it properly for legal." Pl.'s Mot. for Summ. J., Ex. B at 1. Ms. Canton responded to Ms. Kish and said not to mention anything about plaintiff's medical situation or disability and instead to write that the "employee is unable to perform the

28

essential/required functions of his position." Id.  Ms. Kish changed the language on the notice in accordance with Ms. Canton's instructions.

Even though she changed the language on the form, Ms. Kish, as one of the decision-makers regarding plaintiff's job, made the comment about plaintiff's removal from Sprint due to his medical disabilities in the context of terminating plaintiff.  A reasonable jury could find that Ms. Kish's comment is "tied closely enough to the challenged employment action" such that no inference need be drawn to find discrimination. See Burrell v. Bd. of Trustees of Georgia Military Coll., 125 F.3d 1390, 1394 n.7 (11th Cir. 1997) (direct evidence is narrowly tailored to a specific event rather than a broad or vague statement not tied closely enough to the challenge action); Lovell v. Champion Car Wash, LLC, No. 3:12-00254, 2013 WL 4718992, at *5-6 (M.D. Tenn. Sept. 3, 2013) (finding evidence of direct discrimination where employer made unilateral decision that the plaintiff was unable to work based on a medical note and stated that the plaintiff was terminated for medical reasons and his medical needs could not be met).

With regard to circumstantial evidence, there are genuine issues of material fact as explained above about whether plaintiff was a qualified individual and therefore met his burden to establish a prima facie case. Assuming he met that burden, defendant must then articulate a legitimate, non-discriminatory reason for the challenged action. Palmer v. Albertson's LLC, 418 Fed. App'x 885, 887 (11th Cir. 2011). Defendant maintains that its legitimate non-discriminatory reason for terminating plaintiff was that he could not perform the essential functions of his position and that it properly relied upon Dr. Quisling's February Form.

Next, "the plaintiff must introduce significantly probative evidence that the asserted reason is merely a pretext for discrimination in order to avoid summary judgment." Calvo v. Walgreens Corp., 340 Fed. App'x 618, 624 (11th Cir. 2009) (quotation omitted). "A plaintiff may show pretext by pointing to weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason or by producing other evidence which permits the jury to reasonably disbelieve the employer's proffered reason." Id. (internal citation and quotation omitted).

30

Genuine issues of material fact remain about whether plaintiff could perform the essential functions of his job. A reasonable jury could find defendant's reason to be implausible considering defendant had not ever written up plaintiff for his performance leading up to the February termination and that there were no problems with any of the 10-16 monthly customer briefings that plaintiff assisted with from July 2011 to February 2012. Additionally, a reasonable jury could find defendant's proffered reason weak or implausible because it hinges on Dr. Quisling's February Form. A jury could infer from the February Form that Dr. Quisling did not prohibit plaintiff from working and instead that Dr. Quisling recommended accommodations to help plaintiff perform his duties. See id. at 625 (finding that the plaintiff had demonstrated that the employer's reason for termination may be weak and implausible because it hinged on a doctor's note, which could be interpreted as allowing her to return to work with accommodations). Moroever, a reasonable jury could find that the email exchange described above, if not direct evidence of discrimination, was evidence of pretext for discrimination and showed that plaintiff's termination was more likely motivated by his disability.

31

Therefore, because genuine issues of fact remain and there is evidence from which a jury could find either direct or circumstantial evidence, the Court cannot grant summary judgment on plaintiff's claim that defendant discriminated against him because of his disability by terminating him.

## II. Retaliation

Pursuant to 42 U.S.C. § 12203(a), "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."

Defendant argues that plaintiff's retaliation claim is a duplicate of his termination claim under the ADA. Plaintiff responds that it was proper for him to plead a retaliation claim as an alternative to his termination claim. He argues that his claim is not duplicative because after he made his accommodation request to Ms. Kish, he suffered two adverse actions. First, he received no response to his accommodation request, and second, he was terminated. He contends that there is a close temporal proximity and causal

32

link between his accommodation requests to Ms. Kish and his termination. Plaintiff asserts that pretext is shown from his and his co-workers' testimony that he could perform his essential functions along with Ms. Kish's statement that he could lose his job.

After a review of plaintiff's retaliation claim, the Court finds that it is a duplicate of his discrimination claim under the ADA. The acts plaintiff describes in support of his retaliation claim relate to his discrimination and reasonable accommodation claims, not to any retaliation claim. See Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1261 (11th Cir. 2001) (where the acts described by the plaintiff to allege a retaliation claim related to a failure to accommodate him and engage in an interactive process, finding that the retaliation claim was merely a "reclothe[d]" ADA discrimination claim).[13]

---

[13] In his complaint, plaintiff alleges that defendant retaliated against him after he filed his EEOC charge by seeking collection of an alleged debt of $640. Plaintiff has not addressed this claim in defending his retaliation claim, and therefore, the Court finds this claim to be abandoned. See Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) (grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned).

33

III. Punitive Damages

Defendant moves for summary judgment on plaintiff's claim for punitive damages. The remedies for Title I of the ADA are the same as those for Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e(b). 42 U.S.C. § 12117; Albra v. Advan, Inc., 490 F.3d 826, 829 (11th Cir. 2007). Under Title VII, plaintiff must provide evidence that defendant "has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 530 (1999) (quotation omitted).

Plaintiff argues that there are outstanding issues of fact that preclude granting summary judgment for defendant on plaintiff's punitive damages claim.  Plaintiff contends that a reasonable jury could find that defendant acted recklessly or with malice by purportedly firing him for the unsupported reason that he was not able to perform his essential job functions.  Plaintiff asserts that a jury could find that Ms. Kish made false statements to Mr. Heiman inducing defendant to fire him, and that she showed reckless disregard of his rights when she concluded that he could not complete his essential functions every day as an engineer unless she accommodated him.

34

Finally, plaintiff asserts that defendant's documents – the updated job description from February 2012 and the LMG letter denying plaintiff short-term disability benefits – show malice and a reckless disregard for his rights.

"Malice means an intent to harm and recklessness means serious disregard for the consequences of one's actions." <u>Ferrill v. Parker Grp., Inc.,</u> 168 F.3d 468, 476 (11th Cir. 1999) (quotation omitted). The Court finds the evidence presented by plaintiff is not sufficient to show that defendant had an intent to harm plaintiff or acted with the serious disregard for the consequences of its actions. Ms. Kish consulted with Human Resources in the months leading up to plaintiff's termination, and she asked plaintiff repeatedly if there was anything she or the team could do to help him. She informed him of his rights and encouraged him to see his doctor in an effort to help him. <u>See</u> Kish Dep. at 288:21-289:2 ("This process has lasted for – it lasted for nearly a year. And during that whole time, I'm the one that had to continually ask him to get information from his doctor to help him."). The outstanding fact issues described by plaintiff, even if found in plaintiff's favor, do not rise to the level of malice or recklessness. Also, a finding of intentional discrimination, if found by a jury in this case based on direct or

35

circumstantial evidence, is not sufficient on its own and does not constitute the required malice and recklessness to sustain a punitive damages claim. See Ferrill, 168 F.3d at 477 (although evidence showed that defendant intentionally discriminated on the basis of race, punitive damages claim could not succeed where there was a specific lack of racial animus).

Even if Ms. Kish had shown malice or recklessness, plaintiff has not provided sufficient evidence to impute liability for punitive damages to Sprint. See Kolstad, 527 U.S. at 530. "[A]n employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII." Id. at 545 (quotation omitted).  Plaintiff has not shown that Sprint did not undertake good-faith efforts to comply with Title I of the ADA.  Instead, plaintiff admits that Sprint has adopted an Equal Employment Opportunity Statement declaring that it will not discriminate against anyone due to a disability and that Sprint has a reasonable accommodation policy.  Therefore, the Court grants defendant's motion for summary judgment on plaintiff's punitive damages claim.

AO 72A
(Rev.8/82)

IV. Mitigation of Damages

"The purpose of relief under the federal employment anti-discrimination laws is to make persons whole for injuries suffered on account of unlawful employment discrimination." U.S. E.E.O.C. v. Massey Yardley Chrysler Plymouth, Inc., 117 F.3d 1244, 1251 (11th Cir. 1997) (quotation omitted). The plaintiff has a duty to mitigate his damages by being reasonably diligent in seeking substantially equivalent employment. Id. The burden is on the employer to prove the plaintiff lacked diligence. Id. at 1252. "Substantially equivalent" means "employment that affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status" compared to the job from which the plaintiff was terminated. Weaver v. Casa Gallardo, Inc., 922 F.2d 1515, 1527 (11th Cir. 1991) (superseded by statute on other grounds).

Defendant argues that plaintiff has not made reasonable efforts to locate comparable work because he did not accept two positions with Sprint, took an unpaid position with his son's catering business, applied for four jobs that were not comparable, and then accepted a part-time contract in November 2012. Plaintiff responds that he applied for over fifty jobs during

37

his nine-month period of unemployment and defendant has failed to meet its burden to show that the two jobs with Sprint were comparable work.

The Court finds that there is sufficient evidence in the record from which a jury could conclude the plaintiff was reasonably diligent in seeking employment.  Plaintiff has submitted a record of his job search, which shows that he applied and inquired about much more than the four positions noted by defendant.  Questions of fact also remain about whether any of these positions were substantially equivalent to plaintiff's position with Sprint. Therefore, the Court denies defendant's motion for summary judgment on plaintiff's failure to mitigate his damages.

## V.  Conclusion

The Court grants summary judgment for defendant on plaintiff's claims for retaliation and punitive damages.  The Court denies summary judgment on plaintiff's claims for discrimination based on his termination and defendant's failure to accommodate as well as plaintiff's failure to mitigate his damages because genuine issues of material fact remain on these issues.

38

Pursuant to Local Rule 16.7, the Court's review of plaintiff's remaining claims has led it to conclude that mediation may provide savings in time and costs to the litigants without sacrificing the quality of justice. Accordingly, pursuant to Local Rule 16.7B(1), the Court hereby REFERS this case to mediation and DIRECTS all parties and their counsel to participate.

In accordance with Local Rule 16.7(F), the Court DIRECTS:

(1) Each party to submit to the Court a list of the names of three (3) possible mediators from which the Court may select the mediator for this matter; or

(2) The parties to jointly submit to the Court the name of a mutually agreed upon mediator.

The parties must make their submissions to the Court within thirty (30) days from the date of entry of this order. If the parties are unable to agree on a mediator, the Court will appoint one. The parties shall each pay one-half of the costs of mediation.

Summary

For the foregoing reasons, the Court DENIES plaintiff's motion for summary judgment [#49]; GRANTS IN PART AND DENIES IN PART

defendant's motion for summary judgment [#53]; REFERS this case to mediation; DIRECTS the parties to select a mediator in accordance with the instructions herein; and STAYS all proceedings in this case pending completion of mediation.

IT IS SO ORDERED, this ____ day of December, 2013.

Marvin H. Shoob, Senior Judge
United States District Court
Northern District of Georgia

40